IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
        v.                      )        Criminal No. 3:21-27-2
                                )        Judge Stephanie L. Haines
AMANDA ROBINSON                 )

## OPINION

Defendant Amanda Robinson stands charged by indictment with possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii).  On November 12, 2023, Defendant filed a motion to suppress [Doc. 88].  The Government filed a response in opposition to that motion on December 19, 2023 [Doc. 96].  A hearing on the motion was held on March 26, 2024, and a transcript of that hearing was filed on April 17, 2024 [Doc. 104].  On May 17, 2024, the Government filed a post-trial brief in opposition to the motion to suppress [Doc. 108], and Defendant filed a post-trial brief in support of the motion to suppress that same day [Doc. 109].  On May 24, 2024, the Government filed a reply to Defendant's post-trial brief [Doc. 110].  By order dated May 28, 2024, the Court granted Defendant's motion for leave to file a sur-reply [Doc. 112].  Nevertheless, despite requesting, and being granted, leave to do so, Defendant declined to file a sur-reply by the June 3, 2024 deadline. Having received all papers it had expected to receive, the Court took the matter under advisement on June 4, 2024.  On July 3, 2024, the Court entered an order denying Defendant's suppression motion [Doc.116].   This opinion now follows.

I.      **Background**

At the suppression hearing, the Government presented the testimony of Cambria County Sheriff's Deputy Clint Divido, who also is a deputized task force officer with the United States

Marshal Service Fugitive Task Force, and Detective Brent Hinterliter of the Cambria County District Attorney's Office/Cambria County Drug Task Force.    Defendant Amanda Robinson testified on her own behalf.    The testimony and evidence elicited at the hearing relevant to the issues presently before the Court briefly are summarized as follows:

On April 6, 2021, Cambria County Court of Common Pleas President Judge Norman Krumenacker issued a bench warrant on a probation violation for Tiffany Ridenour [Govt. Ex. 1]. Deputy Divido testified that on April 15, 2021, he received information from a confidential source that Ridenour was staying with Michael Knisely[1] in Room 315 of the EconoLodge [Doc. 104, p. 10], located at 430 Napoleon Street in Johnstown.    At around 9:00 a.m. on April 16, 2021, Divido, along with Parole Agent Brian Clawson, Deputy Sheriff Frank Kiefer, and Pennsylvania State Police Trooper Steve Liston arrived at the EconoLodge to conduct a "knock-and-talk" to see if Ridenour was in Room 315 with Knisely [*Id.* at 11].    Divido testified that when they arrived at the door, the officers were arranged in a "stack" with Divido first on the right side of the door opposite the handle, followed by Liston, Clawson and then Hinterliter[2] [*Id.* at 12].

Divido knocked on the door, which was answered by a female, later determined to be Robinson  [*Id.*].    Divido asked her for her name, and she asked why he needed her name [*Id.* at 13].    About "five to ten seconds" after the door was opened, while engaged in conversation with Robinson, Divido heard and saw movement on the bed closest to the doorway [*Id.* at 13, 14].    He stepped inside the room and ordered the man laying there to show his hands, and the man complied

---

[1] Michael Knisely was charged along with Defendant Robinson at Count One of the Indictment in this case.    On February 10, 2022 Knisely pled guilty to Count One [Doc. 44].    On June 23, 2022, Knisely was sentenced to a term of imprisonment of 60 months, and Judgment was entered on June 27, 2022 [Doc. 64].

[2] This clearly was a mis-statement by Divido, as Hinterliter did not appear on the scene until later. Kiefer was the fourth officer on the scene at that time.

[*Id.* at 13].   Divido testified that once he crossed the threshold, he took only one step inside and was able to see the entire bed [*Id.* at 15].

Divido, in his tactical gear, advised the man that they were the police and asked if they could step inside and talk to him, and the man said they could [*Id.* at 17].   Clawson came in to cover the bathroom and Divido cleared the left side of the bed and the middle between the two beds [*Id.*].   At this point, Liston was in the hall talking to Robinson [*Id.*].   Divido told the man, who identified himself as Knisely, that they were looking for Ridenour [*Id.* at 18].   Knisely denied knowing Ridenour but identified the female at the door as Robinson [*Id.*].   Divido asked Knisely for consent to look for Ridenour, and he said yes [*Id.* at 19].   Divido then moved to the far side of the bed between the curtain and the floor [*Id.*].   During this search, Divido noticed a spoon and needle on top of the nightstand near the front next to a clock [*Id.*].

After Robinson came into the room with Liston, Divido asked Knisely if he had any identification, who responded it was in his wallet [*Id.* at 20].   The wallet was located on the second shelf of the nightstand, and Knisely consented to Divido retrieving it for him for safety reasons. While retrieving the wallet, Divido observed several bundles of suspected heroin on the second shelf of the night stand next to the wallet [*Id.* at 20-21].   At that point, Knisely and Robinson both were detained, and Divido contacted Detective Hinterliter [*Id.* at 21].   Hinterliter arrived about "twenty minutes, half hour" later for further investigation [*Id.*].

Hinterliter testified that he was contacted by Divido to respond to the EconoLodge on April 16, 2021 for suspected narcotics and paraphernalia in plain view [*Id.* at 59].   It took about 20 or 25 minutes for Hinterliter to arrive [*Id.*].   Hinterliter identified himself to Robinson and Knisely and asked both for consent to search the room [*Id.* at 60-61].   After both gave verbal consent, he went back to his vehicle to retrieve written consent forms [*Id.* at 61].   Hinterliter testified that,

3

based on his experience, neither Robinson nor Knisely appeared under the influence, and indicated that if he had detected that either of them did not understand what he was doing, he would have made application for a search warrant [*Id.* at 63]. Hinterliter further testified that he provided both Robinson and Knisely with a waiver of rights and consent form [Govt. Ex. 10], which they both read, and he also read to them [Doc. 104, p. 64]. The consent form was signed by both Robinson and Knisely [Govt. Ex. 10].

Robinson testified that she had been staying at the EconoLodge for about seven days leading up to April 16, 2021 [Doc. 104, p. 89]. She stated that she is a recovering addict [*Id.*], and that she had last used heroin about "8:00, 9:30" before she went to bed [*Id.* at 91]. As to the events of April 16, she testified that she heard a knock on the door and first thought it was housekeeping [*Id.* at 92]. Knisely told her it was "her turn" to get the door so she got up and looked through the peephole and saw "figures" and was confused [*Id.*]. She heard yelling so she opened the door "a quarter to halfway," when she was "pushed back" [*Id.* at 93]. The officers were screaming and yelling and asking her "where's Tiffany?," and then someone shoved a phone in her face and said "Tiffany Ridenour" [*Id.*]. She testified that there was "a lot of wrestling around" and remembered them "looking around" [*Id.* at 94]. She later testified that the officers' entry into the room was "immediate," and that she did not even open the door, it just came back at her and within seconds the officers were in the room [*Id.* at 104-105].

Robinson further testified that at one point Clawson took her out into the hallway and asked her if she knew where Tiffany was and that they had received a tip she had been in the room [*Id.* at 95]. Robinson told him that she and Knisely were the only ones who had been there [*Id.*]. As to her state of mind at that time, Robinson testified that she was "frantic" with "a lot of anxiety" and other withdrawal symptoms [*Id.* at 98].

4

Robinson also testified as to the circumstances surrounding her signing of the consent to search form. She testified that she had a conversation with Knisely where he indicated he was going to sign because "they already have probable cause" [*Id.* at 99]. She was uncertain, however, because the room was not in her name and she was not sure what would be the right thing to do [*Id.*]. She testified that she asked if she could call her lawyer, and was told she could but "that he probably wouldn't answer" [*Id.*]. Robinson stated that after Knisely signed, someone put a pen into her hand, and she sat there holding the pen trying to decide whether to sign or not sign [*Id.* at 100-101]. After thinking about it for "a long time," Robinson signed the consent form [*Id.* at 101]. As to her perception at the time, she recalled that her thoughts were racing, her foot was shaking, and that she was "just thinking and thinking" [*Id.* at 102]. However, Robinson testified that she did understand what Hinterliter was saying to her [*Id.*].

After obtaining both verbal and written consent from both Knisely and Robinson, the officers searched the hotel room and seized 628.57 grams of methamphetamine, 0.33 grams of cocaine, 0.25 grams of heroin, 0.31 grams of fluorofentanyl, and 0.54 grams of fentanyl, along with United States currency [Doc. 96 ¶ 33].

## II.     Standard of Law

When a defendant moves to suppress evidence, he bears the initial burden of establishing a basis for his motion. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013). That burden easily is satisfied when, as here, law enforcement conducted the challenged search without a warrant. *Johnson*, 63 F.3d at 245. The burden then shifts to the Government to prove by a preponderance of the evidence that the officers conducted the warrantless search in a manner consistent with the Fourth Amendment. *Id.* at 245; *see also United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015).

A.      **General Fourth Amendment Principles**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"'[W]hen it comes to the Fourth Amendment, the home is first among equals.'" *Lange v. California*, 594 U.S. 295, 303 (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). At the Amendment's "'very core,'" . . . stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" *Id.* (quoting *Collins v. Virginia*, 584 U.S. 586, 592 (2018)). It also is well-settled that the Fourth Amendment's protection of the home extends to guests staying in hotel rooms. *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006); *see also Stoner v. State of Cal.*, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house ... a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.").

Accordingly, as a basic principle of Fourth Amendment law, "'searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Kentucky v. King*, 563 U.S. 452, 459–60 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Moreover, this presumption applies equally to a warrantless entry in order to make an arrest as it does an entry to conduct a search. *Steagald v. United States*, 451 U.S. 204, 211–12 (1981); *see also Payton v. New York*, 445 U.S. 573, 590 (1980). However, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City*, 547 U.S. at 403, the presumption may be overcome, and the warrant requirement therefore is subject to certain reasonable exceptions. *Id.*

6

One well-recognized exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 459–60. Under this exigent circumstances exception, an officer, for example, may "enter a home without a warrant to render emergency assistance to an injured occupant[,] to protect an occupant from imminent injury," or to ensure his own safety. *Lange*, 141 S. Ct. 2011, 2017, 210 L. Ed. 2d 486 (2021) (quoting *Brigham City*, 547 U.S. at 403). Another exception is consent, which, if given voluntarily, authorizes a warrantless search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Reedy v. Evanson*, 615 F.3d 197, 225 (3d Cir. 2010).

However, the contours of any warrant "exception permitting home entry are 'jealously and carefully drawn,' in keeping with the 'centuries-old principle' that the 'home is entitled to special protection.'" *Lange*, 594 U.S. at 303 (quoting *Georgia v. Randolph*, 547 U.S. 103, 109, 115 (2006)); *see also Caniglia v. Strom*, 593 U. S. 194, 199 (2021) ("[T]his Court has repeatedly declined to expand the scope" of "exceptions to the warrant requirement to permit warrantless entry into the home"). Accordingly, "unless the occupants consent or probable cause <u>and</u> exigent circumstances exist to justify the intrusion," a warrantless entry into, and subsequent search of, a home are presumed to be unreasonable. *Coles*, 437 F.3d at 365 (citing *Steagald*, 451 U.S. at 211; *Payton*, 445 U.S. at 586).

## III. Analysis

Defendant Robinson seeks suppression of all evidence seized from Room 315 of the EconoLodge on April 16, 2021. She argues that the officers lacked probable cause to enter without a search warrant the hotel room in which she had a reasonable expectation of privacy in order to look for the subject of an arrest warrant. She further argues that the exigent circumstances the

officers used to justify their warrantless intrusion into the room were created by the officers themselves, and that her subsequent consent to search the room was not voluntary.

As both parties acknowledge, a critical aspect of this Court's analysis turns on the credibility of the testifying witnesses. Divido and Robinson gave widely disparate accounts of the events surrounding the officers' initial entry into the hotel room. Similarly, on the issue of consent, the testimony of Robinson differed from that of Hinterliter. Accordingly, the credibility of these witnesses will be a critical factor in determining whether the initial entry into the hotel room was lawful, and whether Robinson's subsequent consent to search was voluntary.

On a motion to suppress evidence, the trial judge sits as the finder of fact, and thus it is for the court to assess the credibility of the witnesses, weigh the evidence, and reach any "inferences, deductions and conclusions to be drawn from the evidence." *See, e.g., United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019). As the finder of fact, the court is free to accept or reject any or all of a witness's testimony. *United States v. Conley*, 859 F.Supp. 830 (W.D. Pa. 1994). Credibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic. *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)

When a defendant takes the stand to testify, her credibility is to be judged in the same way as any other witness. *Murphy*, 402 F. Supp.2d at 569 (citing *United States v. Morrone*, 502 F. Supp. 983, 991 (E.D. Pa.1980)). Likewise, the testimony of a witness is not to be judged more or less credible because the witness is a law enforcement officer. *Murphy*, 402 F. Supp. 2d at 569-

70 (citing *United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) (viewing favorably use of jury charge instructing that testimony of law enforcement officer not necessarily entitled to any more, or any less, weight than any other witness); see also *Conley*, 859 F.Supp. at 840 (government witnesses are not per se credible or even presumed to be credible).

With the foregoing standards in mind, and upon review of the record and consideration of the testimony and evidence received at the suppression hearing, for the following reasons, Defendant's motion to suppress has been denied.

### A.      Credibility

This Court's first order of business is to resolve the factual dispute as to how the officers actually gained entry into the hotel room on April 16, 2021.  According to Divido's testimony, upon a tip that Ridenour was staying in Room 315, four officers arrived at the EconoLodge for a "knock-and-talk" in an effort to determine if she was there.  When Robinson opened the door, Divido asked her for her name, which she did not immediately give to him.  Approximately "five to ten seconds" after the door was opened, Divido heard and saw movement on the bed closest to the doorway.  He then crossed the threshold and took one step inside the room, which allowed him to see the entire bed and observe Knisely lying there.  At this point, Robinson was taken into the hallway with Liston.  Divido asked for and received consent from Knisely to enter the room, then to search for Ridenour, and then to retrieve Knisely's wallet from the nightstand.

Divergently, Robinson testified that she awoke to a knock on the door, which she initially believed to be housekeeping.  Looking through the peephole she saw "figures" and heard yelling, but she nevertheless opened the door "a quarter to halfway."  She immediately was pushed backward by the officers bursting into the room.  The officers were screaming and yelling "where's

Tiffany?" and one of them shoved a phone into her face. She testified that there was "a lot of wrestling around," and that the officers were in the room within seconds.

Upon observation of the witnesses' demeanor and consideration of their testimony, the Court finds that Divido's version of the events in question is more credible than that of Robinson's. Divido's demeanor on the stand was professional and, despite the nearly three year time lag, he appeared to accurately recollect the most salient points of the events at hand, while freely acknowledging when he could not recall a matter in detail. He also has little stake in the outcome of this matter.

On the other hand, the Court finds that Robinson's testimony was less than credible. Significantly, she clearly has a much larger interest in the outcome of the matter, and in fact testified that she remembers specifically telling the officers at the time that she was "very scared to get in trouble again" [Doc. 104, p. 95]. Her demeanor at the hearing was anxious and her speech at time was rushed. Despite the length of time that has passed since the events in question, and the fact that she repeatedly testified as to how anxious and confused she was at the time, she nevertheless contradictorily testified at the hearing that "I remember it all so clearly" [Doc. 104, p. 93]. Moreover, her testimony fails to withstand any common-sense test of reason and logic. It simply is not believable that experienced officers would have burst into the room screaming and yelling simply to determine whether an individual wanted on a bench warrant for a probation violation was present. It also does not make sense that the officers would have pushed Robinson inside the room as she testified, rather than initially take her out into the hall as Divido testified occurred. This inconsistency is further evidenced by Robinson's testimony that she initially was seated on a chair in a room, then "at one point they took me out in the hallway" [Doc. 104, p. 95], before she ultimately was returned to the room.

Accordingly, the Court finds that Divido's account of the events that transpired is far more credible than that of Robinson's, and will accept his version in analyzing the constitutional issues raised in this case.

### B.    Entry

It is undisputed that the officers in this case did not have a search warrant for Room 315 at the EconoLodge.  It also is undisputed that Robinson had a protectible Fourth Amendment privacy interest in that hotel room.  Accordingly, absent the occupants' voluntary consent, or probable cause <u>and</u> exigent circumstances, the officers' warrantless entry into, and subsequent search of, the hotel room is presumed to be unreasonable.  *Coles*, 437 F.3d at 365 (citing *Steagald*, 451 U.S. at 211; *Payton*, 445 U.S. at 586).  Here, because the officers' actions were reasonable, the Court finds no Fourth Amendment violation in either the entry into or subsequent search of Room 315.

Initially, the officers were well within their rights in approaching the hotel room and knocking even absent a warrant.  So called "knock and talk" investigations "normally do not raise Fourth Amendment concerns . . . because 'when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.'"  *United States v. Butler*, 405 F. App'x 652, 656 (3d Cir. 2010) (quotation omitted).  Of course, even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.  *Kentucky v. King*, 563 U.S. 452, 469–70 (2011).  Accordingly, because an occupant is free not to cooperate with a "knock and talk" investigation, police cannot detain them, demand entry into their homes, or otherwise compel their

cooperation without a warrant, unless an exception to the warrant requirement applies. *United States v. Butler*, 405 F. App'x at 656–57.

In this case, the officers approached the door and knocked.  Although Robinson testified that she initially thought it was housekeeping, she nevertheless chose to open the door, even after looking through the peephole and being confused by "figures" and "yelling" [Doc. 104, p. 92]. Even after opening the door, Robinson was free to not cooperate, answer questions or permit entry into the room.  And, in fact, Divido testified that Robinson did refuse to tell him who she was [Doc. 104, p. 13].  Thus, to this point, the Fourth Amendment had not yet been implicated.

Defendant suggests that because the officers were in possession of a description of Ridenour, as well as a small photograph of her [Govt. Ex. 1], they should have known immediately that the woman who opened the door was not Ridenour simply by her height, weight, hair color, skin tone and general appearance, with the implication being that the officers should have immediately terminated the encounter at that precise moment.  Divido, however, testified credibly that he was not able to determine when the door first was opened whether the female who answered was Ridenour or someone else, and further that the female who answered in fact would not tell him what her name was [Doc. 104, p. 13].  In any event, even if Divido had known immediately that Robinson was not Ridenour, he could not have been certain that Ridenour was also not present in the room, and it still would have been permissible under the "knock and talk" technique to ask whoever opened the door if Ridenour was inside.  Thus, the fact that Ridenour and Robinson may not look alike has no bearing on the Fourth Amendment analysis.

Once the door was opened and Divido was at the threshold talking to Robinson, exigent circumstances created when he observed movement on the bed closest to the door permitted Divido

to cross the threshold and take one step inside the door to see who was on the bed in order to protect his own safety and that of his fellow officers.

As already noted, an exception to the warrant requirement applies where "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. at 460. The exigent circumstances exception is applied on a "case-by-case basis," *Birchfield v. North Dakota*, 579 U.S. 438 (2016), which requires courts to consider the "totality of circumstances." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013). Exigent circumstances include, among others, "danger to the lives of officers or others" or "the possibility that evidence may be removed or destroyed." *United States v. Anderson*, 644 Fed.Appx. 192, 194 (3d Cir. 2016) (citing *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006)); *see also Brigham City*, 547 U.S. at 403 (officer may enter a home without a warrant, *inter alia*, to ensure his own safety).

Whether exigent circumstances existed is to be evaluated by an objective standard; the subjective intent of the officer is irrelevant. *Brigham City*, 547 U.S. at 404. The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is "heavy." *United States v. Mallory*, 765 F.3d 373, 383–84 (3d Cir. 2014) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984)).

In the context of the scene at the EconoLodge, Divido reasonably was concerned for his own safety and that of his fellow officers when he observed movement on the bed closest to the door and heard a "rustling" noise [Doc. 104, p. 15]. From his vantage point at the threshold, he could not see the whole bed, and he had no idea who may have been on the bed, or if that individual was holding a weapon. Moreover, Divido testified that, based on his training, he was familiar with the "fatal funnel," the concept that if an officer is standing in a doorway, he is an easier target

13

because he is occupying 90 percent of that doorway [Doc. 104, p. 8].   Accordingly, when he

noticed movement on the bed, it was reasonable for Divido to step into the room in order to ensure

his own safety.   Furthermore, his initial entry was limited, merely crossing the threshold and

stepping one foot in until he was able to view the entire bed and see Knisely.   Based on Divido's

testimony, which this Court finds to be wholly credible, this Court finds that under the

circumstances present at the time, Divido's minimal entry across the threshold into the hotel room

was warranted by exigent circumstances.

Defendant observes, correctly, that the Fourth Amendment requires both probable cause

*and* exigent circumstances in order to justify a warrantless entry.   In this case, she argues, probable

cause was lacking.   However, in an emergency, when compelled to enter by a desire to ensure their

own safety, "the probable cause element may be satisfied where officers reasonably believe a

person is in danger." *McNeil v. City of Easton*, 694 F. Supp. 2d 375, 387–88 (E.D. Pa. 2010)

(citing *United States v. Holloway*, 290 F.3d 1331, 1337-38 (11th Cir. 2002)).   Here, as already

discussed, Divido's reasonable belief that he was in danger from the exigent circumstances created

when he observed movement on the bed and he was standing in the doorway as an easy target

likewise satisfies the probable cause element.

Defendant further argues that the warrantless entry was unreasonable because the officers

themselves created the exigency. *See United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006)

(exigent circumstances do not meet Fourth Amendment standards if the Government deliberately

creates them).   In this case, Defendant argues that the Government created the exigent

circumstances by going to the hotel room armed only with a "run of the mill" bench warrant for a

probation violation, and by not doing their "due diligence" in determining beforehand whether the

tip they received from the confidential source that Ridenour was staying there in fact was accurate.

14

According to Defendant, the officers should have attempted to corroborate the information in advance by surveilling the hotel, looking at security camera footage, and asking the desk clerk whether he had seen Ridenour or knew if she was occupying the room.

However, the Supreme Court has rejected the notion that officers may be found to have created or manufactured an exigency if a court concludes that the course of their investigation was "contrary to standard or good law enforcement practices (or to the policies or practices of their jurisdictions)." *Kentucky v. King*, 563 U.S. at 467 (citation omitted). The Supreme Court determined that such an approach "fails to provide clear guidance for law enforcement officers and authorizes courts to make judgments on matters that are the province of those who are responsible for federal and state law enforcement agencies. *Id.*, 563 U.S. at 467–68.

Instead, the Supreme Court determined that:

> warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement. Therefore, the answer to the question before us is that the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.

*Kentucky v. King*, 563 U.S. at 462.

In the present case, the exigency justifying the minimal entry into the hotel room was to ensure officer safety rather than to prevent the destruction of evidence. However, the same rationale applies. The question in this case is whether Divido's actions prior to the exigency were reasonable. As already found, the answer to this question clearly is yes, because the officers' "knock and talk" investigation raised no Fourth Amendment concerns. Accordingly, because the officers did not create the exigency by engaging in, or threatening to engage in, conduct that would have violated the Fourth Amendment, their actions in light of the exigency were reasonable.

C.      Consent

As already noted, consent if given voluntarily, authorizes a warrantless search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "[W]e determine the voluntariness of a consent by examining the totality of the circumstances." United States v. Stabile, 633 F.3d 219, 231 (3d Cir. 2011) (citing *United States v. Price*, 558 F.3d 270, 278; *Schneckloth*, 412 U.S. at 227). Factors to consider include "age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment." *Price*, 558 F.3d at 277-278. The "'setting in which the consent was obtained [and] the parties' verbal and non-verbal actions'" are also relevant. *Price*, 558 F.3d at 278 (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)). The Government has the burden of establishing, by a preponderance of the evidence, that the challenged statements were voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986).

Robinson argues that her consent was not voluntary. To the extent Robinson testified that her symptoms of withdrawal (i.e., anxiety, sweats, goosebumps, chills, flu-like symptoms [Doc. 104, p. 98]) were so overwhelming as to render her consent involuntary, the Court again finds her testimony in this regard less than credible. While not disputing that Robinson may not have been feeling at her best, she never testified that she was so confused as to not know what she was doing. To the contrary, when directly asked whether she was able to process what Hinterliter was saying to her, she explicitly testified, "I mean, yeah, I think. I did understand, you know ... I understood what he was saying" [Doc. 104, p. 102]. Additionally, when testifying about the events of April 16, 2021 at Room 315 of the EconoLodge, Robinson testified, "I just remember it so clearly" [Doc. 104, p. 93].

It is clear from her testimony that she seriously weighed both the pros and cons of consenting as she admitted she "thought about it for a long time," read the form carefully, and stated that "nobody grabbed my hand and made me" sign it [Doc. 104, pgs. 101, 114-115]. While her hesitation may have been spurred by a fear of getting into trouble, it was not caused by an inability to voluntarily consent due to symptoms of withdrawal. Furthermore, she was clearheaded enough to ask Knisely for his advice, and at one point, she asked if she could call her lawyer [Doc. 104, p. 99].

Hinterliter's testimony further evidenced the voluntary nature of Robinson's consent to search. As he had throughout his extensive law enforcement career,[3] Hinterliter utilized and followed a specific process when seeking consent to search [Doc. 104, pgs. 58-59]. In addition to presenting the consent to search waiver form [Govt. Ex. 10] to Robinson for her to read, Hinterliter also read the entire form to her, and provided her with the opportunity to ask any questions she may have about the form [Doc. 104, pgs. 63-64]. As Hinterliter credibly testified, if he would have detected that Robinson or Knisely did not understood what he was doing with the waiver form, he would have made application for a search warrant [Doc. 104, p. 63].[4] Accordingly, the Court finds that Hinterliter's account of the events that transpired relative to the issue of Robinson's consent to search is far more credible than hers and will therefore accept his version.

---

[3] Detective Hinterliter has been a law enforcement officer for more than twenty years, currently employed as the Chief County Detective by the Cambria County District Attorney's (DA's) Office. Prior to his current employment, he served as a county detective with the DA's Office, as well as a patrol officer and detective with the City of Johnstown [Doc. 104, p. 57-58]. He has a dual deputization with the United States Marshal Service and the Federal Bureau of Investigation for the Safe Streets Task Force [*Id.* at 58]. He is also an Attorney General Task Force Officer and has a Class A certification in the use of wiretaps and electronic surveillance with the Commonwealth of Pennsylvania [*Id.*].

[4] At the bottom of Govt. Ex. 10, next to the printed name of "Michael Knisely," it appears someone initially wrote in the date of "4-16-11," then wrote a "2" over the first "1" to accurately reflect the date of "4-16-21." While Hinterliter was unsure who printed in this date, based upon his lengthy career and experience, he emphatically rejected the suggestion that whoever put the dates in was so high or going through withdrawal as to not know what the date was [Doc. 104, pgs. 73-75].

**IV.     Conclusion**

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Kentucky v. King*, 563 U.S. at 459 (quoting *Brigham City v. Stuart*, 547 U.S. at 403)).  In this case, there was nothing unreasonable about the warrantless search of Room 315 and the subsequent seizure of evidence.

The Fourth Amendment permits officers without a search warrant to knock on a door and request the opportunity to speak to the occupants.  Here, the officers knocked on the door and Robinson opened it.  While standing in the entry way, Divido's observation of movement on the bed created exigent circumstances permitting him to cross the threshold and step inside in order to ensure the safety of himself and the other officers.  Divido then obtained Knisely's consent to gain further entry into the room, and Knisely's consent to briefly sweep the room to see if anyone else was present.  After also obtaining Knisely's consent to retrieve his wallet for the purpose of identification, Divido observed suspected controlled substances in plain view.  He then called in Hinterliter, who obtained verbal and written consent from both Knisely and Robinson to search the room.  Under the totality of the circumstances, Robinson's consent was voluntary.

Accordingly, this Court is satisfied that the warrantless search of Room 315 was objectively reasonable and conducted in a manner consistent with the Fourth Amendment.  Finding no constitutional violation, Defendant's motion to suppress has been denied.

DATE: _August 14, 2024_

_Stephanie L. Haines_
Stephanie L. Haines
United States District Judge